IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.: 12-cv-60741-SCOLA/Rosenbaum

DUTY FREE AMERICAS, INC.,

      Plaintiff,

v.

THE ESTÉE LAUDER COMPANIES, INC.

      Defendant.

_____

**DEFENDANT ESTÉE LAUDER COMPANIES'
MOTION TO DISMISS PLAINTIFF DUTY FREE AMERICA'S
COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Charles M. Rosenberg (FL Bar # 279064)
crosenberg@carltonfields.com
Aaron S. Weiss (FL Bar # 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
100 Southeast Second Street, Suite 4200
Miami, Florida  33131
Telephone:  (305) 530-0050
Facsimile:  (305) 530-0055

Robert C. Walters *(pro hac vice pending)*
rwalters@gibsondunn.com
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX  75201
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2900

Joseph Kattan, P.C. *(pro hac vice pending)*
jkattan@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9558

*Attorneys for Defendant The Estée Lauder
Companies, Inc.*

Pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), Defendant The Estée Lauder Companies, Inc., moves for entry of an order dismissing Plaintiff Duty Free Americas Inc.'s complaint [DE 1] and in support states:

## SUMMARY OF ARGUMENT

The complaint in this case is based on two factual allegations:  (1) that The Estée Lauder Companies ("Estée Lauder") sent a truthful letter identifying its authorized retailers, and (2) that Estée Lauder declined to resume selling to Duty Free Americas ("DFA") after DFA terminated the parties' business relationship.  Based on these innocuous facts, DFA has filed an antitrust complaint that speculates that Estée Lauder must have conspired with unnamed retailers to exclude DFA from operating duty-free stores, and that Estée Lauder is attempting to monopolize a market in which it does not even participate.  Apart from averring these two benign facts, the complaint relies entirely on speculation and boilerplate recitations of legal conclusions, which it repeats time and again over its 140 paragraphs, as if repetition can remedy a paucity of facts.

The Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), preclude frivolous complaints such as DFA's from cluttering the dockets of the federal courts and burdening defendants with the costs of discovery. Under these decisions, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  Here, the *facts* alleged in the complaint indicate no more than (1) a supplier acted in its unilateral self-interest to promote its authorized retailers and (2) exercised its unassailable right to choose the "parties with whom [it] will deal."  *United States v. Colgate Co*., 250 U.S. 300, 307 (1919).  These facts utterly fail to plead a plausible unlawful conspiracy or attempt to monopolize a market.

## STATEMENT OF FACTS

DFA operates duty-free retail stores in international airport terminals.  Compl. ¶ 1.[1]  At one point, DFA carried Estée Lauder's beauty products.  *Id.* ¶ 5.  In 2007, after Estée Lauder announced a wholesale price increase, DFA "voiced its strong objection to this action and indicated that it would not accept this new pricing."  *Id.* ¶ 9.  As a result, DFA ceased purchasing Estée Lauder products.  *See id.* ¶ 13.  DFA subsequently sought to resume buying from Estée Lauder, but Estée Lauder declined to begin selling anew to DFA.  *Id.*

DFA competes with other duty-free retailers in bids to operate concessions at airports.  DFA obtained at least one airport retail concession (in Atlanta) after it ceased doing business with Estée Lauder.  *See id.* ¶¶ 64-66.  It has also obtained at least five other retail concessions over its lifetime through competitive bidding.  *See id.*; *see also id.* ¶¶ 1.  DFA has also lost some bids for retail concessions to other bidders.  *See id.* at ¶¶ 34, 45, 54.

In December 2008, Estée Lauder sent a letter to the leasing agent for Newark International Airport in which it identified "authorized retailer partners," which "bring[] the expected quality of in-store execution and required operational excellence necessary to represent our brands and service your valued passengers."  *Id.*, Ex. B.  The letter neither mentioned DFA nor referred to anyone other than the authorized retailers.  *Id.*  Based on this letter, DFA alleges that Estée Lauder "conspired" with unnamed DFA competitors to eliminate DFA as a rival and "improperly and maliciously inject [Estée Lauder] into the duty free bid processes . . . ."  *Id.* ¶ 93.  It alleges on "information and belief" that Estée Lauder entered into similar conspiracies with unnamed co-conspirators to exclude DFA from three other airports.  *Id.* ¶¶ 41-42, 52, 61.

---

[1]  This statement assumes the truth of the factual matter of the complaint because the factual allegations of the complaint, as opposed to its conclusions, must be taken as true for purposes of a motion to dismiss.  *See Iqbal*, 556 U.S. at 678-79.

The complaint contains no factual allegations of any communications between Estée Lauder and its alleged co-conspirators. DFA bases its conspiracy claim regarding the Newark airport on speculation that "the only plausible explanation for how ELC [Estée Lauder] could have known that DFA bid for the Newark concession was that one or more of DFA's competitors conspired with ELC to have ELC submit this unsolicited letter . . . ." *See id.* ¶ 32. As to other airports, even the allegation that Estée Lauder or other retailers communicated with airport authorities is made "on information and belief." *Id.* ¶¶ 41, 52, 61.

DFA also alleges that Estée Lauder attempted to monopolize a purported market for beauty products "sold in U.S. airport duty free stores" (*id.* ¶ 126), in which "each airport constitutes a distinct geographic submarket" (*id.* ¶ 85). DFA's only allegation concerning Estée Lauder's position in this alleged market states that its market share is "approximately" 50 percent or higher. *Id.* ¶ 133. DFA also claims conclusorily that Estée Lauder has the "ability to successfully exclude competition." *Id.* The complaint does not identify Estée Lauder's *competitors* or the market in which it competes with them to sell to companies such as DFA.[2]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Under Rule 8, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678. Rather, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 50 U.S. at 570).

---

[2] The complaint also suggests that DFA is a monopsonist, or monopoly buyer, in the submarkets in which it operates duty-free stores, because, "[w]ith rare exception, an airport chooses one duty free operator for all of the duty free stores within that airport." *Id.* ¶ 72. As the only duty-free store operator in alleged submarkets for beauty products sold in duty-free stores at individual airports, DFA has a 100 percent share of the submarkets that it defines.

The Supreme Court has set out a two-step approach for applying this "plausibility" standard. First, "a court considering a motion to dismiss can . . . begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Conclusory allegations must be disregarded in evaluating a complaint's sufficiency. *See id.* Second, after setting aside conclusory allegations, a court must determine whether the remaining factual allegations "plausibly" entitle the plaintiff to relief. To meet this standard, it is not sufficient that the facts alleged are "'consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678-79 (quoting *Twombly*, 550 U.S. at 557). Mere "possibility" of liability is not enough. *Id*. at 679. Importantly, allegations that are "not only compatible with, but indeed [are] more likely explained by, lawful . . . behavior" fall short of plausibility. *Id* at 680. Moreover, a plaintiff alleging a conspiracy must "present allegations showing why it is more plausible that" alleged co-conspirators would "enter into an illegal . . . agreement . . . to reach the same result realized by purely rational profit-maximizing behavior." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010).

This pleading standard serves two important purposes. First, well-pleaded factual allegations help ensure that defendants are given "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal citations omitted). Second, because "proceeding to antitrust discovery can be expensive" (*id*. at 558), the standard avoids "the potentially enormous expense of discovery" by preventing litigation from proceeding based on conclusory complaints (*id.* at 559). Both purposes are served by dismissal of DFA's complaint.

## ARGUMENT

DFA makes three claims under the Sherman Act, 15 U.S.C. § 1 *et seq*.: (1) conspiracy in restraint of trade, under § 1; (2) conspiracy to monopolize, under § 2; and (3) attempted monopolization, also under § 2. All three claims fail for failure to plead plausible factual allegations.

4

## I.      DFA's Complaint Fails to Allege Unlawful Conduct.

### A.      DFA's § 1 Conspiracy Claim Must Be Dismissed Because the Complaint Contains Only Conclusory Allegations of Unlawful Agreement.

To survive a motion to dismiss, a complaint alleging a conspiracy in violation of § 1 of the Sherman Act "must allege 1) an agreement to enter a conspiracy, 2) designed to achieve an unlawful objective." *Aquatherm Indus., Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998). DFA's complaint fails to allege sufficient facts that plausibly show either that Estée Lauder has entered into an agreement with DFA's rivals or that any such agreement had an unlawful objective.

### 1.      DFA Fails to Allege Sufficient Facts to Show the Existence of an Agreement.

In a conspiracy case, "the crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal citations omitted). An antitrust plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 557. A complaint that fails to "mention[] [any] specific time, place, or person involved in the alleged conspirac[y]" fails to provide the notice required by the Federal Rules. *Twombly*, 550 U.S. at 565 & n.10; *see also Tempur-Pedic*, 626 F.3d at 1343 (dismissing conspiracy claim as implausible where there were no allegations that participants "somehow signaled each other on how and when to maintain or adjust prices"); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (plaintiff "must allege facts such as a 'specific time, place or person involved in the alleged conspiracies'") (quoting *Twombly*); *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1292 (S.D. Fla. 2008) (same); *In re LTL Shipping Servs. Antitrust Litig.*, 2009 U.S. Dist. LEXIS 14276, at *45 (N.D. Ga. Jan. 28, 2009) (same).

DFA does not allege any "time, place, or person" involved in any concerted activity between Estée Lauder and one of DFA's competitors. To the contrary, DFA merely speculates, "[u]pon information and belief," that Estée Lauder "conspir[ed] with DFA's competitors" to "maliciously inject itself into the duty free bid processes by making defamatory statements to various U.S. airport authorities." Compl. ¶ 93. Indeed, the complaint frames its allegations as made on "information and belief" no fewer than *25 times*, and consistently alleges the existence of a conspiracy in the most conclusory terms. *Id.* ¶ 111 ("ELC and co-conspirators have entered into agreements and engaged in a conspiracy"); *see also id.* at ¶¶ 17, 32, 42, 52-53, 67.

DFA's speculation that an agreement exists does not provide Estée Lauder with the notice that the Federal Rules require, and its conclusory allegations are not entitled to any pre-sumption of truth on a motion to dismiss. *Twombly*, 550 U.S. at 555; *see also Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985) ("A conclusory allegation of conspiracy to restrain trade will not survive a motion to dismiss."); *Bolinger v. First Multiple Listing Serv.*, No. 2:10-CV-211-RWS, 2012 U.S. Dist. LEXIS 5767, at *60 (N.D. Ga. Jan. 18, 2012) (refusing to accept as true on motion to dismiss conspiracy allegation that was "merely a legal conclusion").[3]

The closest that DFA comes to alleging a *fact* in support of its claim of an agreement is its allegation regarding Estée Lauder's letter to the leasing agent at the Newark airport. The let-ter stated that Estée Lauder "rel[ies] on[] the quality of its authorized trading partners," and that it is "proud to have established strong and mutually beneficial commercial relationships with,

---

[3]  Outside the antitrust area, the Eleventh Circuit has similarly observed that "[i]n conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged," and "[i]t is not enough to simply aver in the complaint that a conspiracy existed." *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984). Rather, "[a] complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy." *Id.*; *see also Nationwide Advantage Mortgage Co. v. Federal Guaranty Mortgage Co.*, No. 09-20372-CIV, 2010 U.S. Dist. LEXIS 80038, at *3 (S.D. Fla. Feb. 26, 2010).

and only with" a list of duty-free operators that excluded DFA. *Id.* ¶ 31. Based solely on the content of this letter, DFA surmises "[o]n information and belief" that its competitors "made [Estée Lauder] aware that DFA bid for the Newark concession." Compl. ¶ 30. It claims that the only possible reason why Estée Lauder submitted this letter was that "one or more" DFA rivals "conspired" with Estée Lauder "to have [it] submit" the letter. *Id.* at ¶ 32.

These allegations are insufficient to suggest plausibly the existence of an unlawful agree-ment in restraint of trade. DFA does not even allege that any communication between Estée Lauder and any DFA rival necessarily took place; it merely speculates that it did. Nor does the complaint identify which rival entered agreed with Estée Lauder to exclude DFA, "or when and where the illicit agreement took place." *Twombly*, 550 U.S. at 564 n.10. And although DFA claims that the purpose of the letter was to harm it, the letter does not even *mention* DFA.[4]

Read most charitably, the complaint merely speculates that one of DFA's competitors must have alerted Estée Lauder to DFA's bid at Newark and that Estée Lauder responded by sending a letter identifying its authorized retailers. Such a chain of events, even if pleaded based on more than speculation, does not plausibly suggest a "conscious commitment" to an unlawful objective. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). In short, the alleged link between Estée Lauder's letter and any unlawful conspiracy is too attenuated to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Moreover, the conspiracy claim is not plausible in light of "obvious alternative explana-tion[s]" for Estée Lauder's conduct, which the Supreme Court in *Twombly* instructed courts to consider when determining whether an antitrust complaint stated a plausible claim for relief. *Id.* at 567; *see id. at* 567-68 (finding that alleged conspiracy was implausible in light of "natural

---

[4] The letter is attached to the complaint and therefore is properly considered on a motion to dismiss. *Solis-Ramirez v. U.S. Dep't of Justice*, 758 F.2d 1426, 1430 (11th Cir. 1985).

explanation" that each company acted independently, but in similar fashion, in wake of deregulation of industry).  DFA's complaint must show that "it is more plausible" that its competitors and Estée Lauder had "enter[ed] into an illegal . . . agreement . . . to reach the same result realized by purely rational profit-maximizing behavior."  *Tempur-Pedic*, 626 F.3d at 1342.  The court must weigh "the potential costs" of the alleged conspiracy against its benefits, "particularly where independent economic activity would yield the same benefits with none of the costs."  *Id.*; *see also Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 908-09 (6th Cir. 2009) (dismissing complaint where the "plausibility of plaintiffs' conspiracy claim is inversely correlated to the magnitude of defendants' economic self-interest" in cutting the commissions at issue).

Here, an "obvious alternative explanation" exists for why Estée Lauder would inform the Newark airport's leasing agent about its authorized retailers:  To enhance its ability to sell its products in the airport's duty-free stores.  Estée Lauder had a sufficient economic incentive to send this letter without conspiring with anyone.  Acting in concert with DFA's competitors was not only unnecessary to advance the objective of the letter but, indeed, could not plausibly advance this objective.  The complaint does not explain why acting in concert would be more effective than acting unilaterally, and no such explanation exists.

Because Estée Lauder's decision to send a letter to the airport leasing agent "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior," DFA's claims of unlawful conspiracy are implausible.  *Iqbal*, 556 U.S. at 680; *see also Tidmore Oil Co. v. BP Oil Company/Gulf Products Div.*, 932 F.2d 1384, 1389 (11th Cir. 1991) (granting summary judgment where "[retailer's] agreement or acquiescence was not necessary for [wholesaler] to effect its decisions, nor was such agreement or acquiescence sought by [wholesaler]").  DFA's conspiracy claims therefore must be dismissed.

2.      **DFA Fails to Allege Sufficient Facts to Show an Unlawful Purpose.**

To prevail on its § 1 claim, DFA must also plead sufficient facts to show that the alleged conspirators "had a conscious commitment to a common scheme *designed to achieve an unlawful objective.*"  *Monsanto*, 465 U.S. at 768 (emphasis added).  Even if DFA's conclusory conspiracy allegations were sufficient to support the existence of an agreement to send a letter to the Newark airport's leasing agent, DFA cannot show that the agreement had an unlawful objective.  Truthfully identifying the retailers that are authorized to sell Estée Lauder products is not unlawful.  The complaint does not allege any other facts in support of its conspiracy claim, and the "legal conclusion[s] 'masquerading' as [] factual allegation[s]," *Tam Travel*, 583 F.3d at 905, with which it abounds, are to be disregarded in assessing its complaint.

Insofar as the logic of DFA's complaint can be discerned, DFA may be alleging (only through conclusions) that Estée Lauder's refusal to resume selling to DFA after the latter stopped buying from it was part of a conspiracy to drive DFA out of business because it objected to Estée Lauder's wholesale price increase.  But even if such an allegation had been pleaded *factually*, it would be insufficient as a matter of law.  The Supreme Court has held that even "an agreement between a manufacturer and a dealer to terminate a 'price cutter,' without a further agreement on the price or price levels to be charged by the remaining dealer[s]," does not violate § 1.  *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717-18 (1988); *see also Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 150, 166-67 (3d Cir. 2003) (affirming summary judgment on conspiracy claim despite some evidence that defendant information service "might have severed its relationship with [plaintiff] at least in part due to pressure from broker-dealers"); *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 19 (1st Cir. 2004) ("The raw fact that a distributor's actions are an attempt to pressure a manufacturer into terminating a distribution relationship with a . . . competitor is not enough . . . to show concerted action[.]").  DFA does not even allege that other

retailers asked Estée Lauder to stop selling to DFA.  It claims only that the alleged conspirators engaged in a "smear campaign," which from the face of the complaint consists of truthfully identifying Estée Lauder's authorized retailers, to "diminish[] DFA's chances" of winning bids at airports.  Compl. ¶¶ 14, 32.[5]

Moreover, the complaint makes plain that it was DFA, and not Estée Lauder, that terminated the parties' business relationship.  It alleges that, after Estée Lauder announced a wholesale price increase, DFA "indicated that it would not accept this new pricing."  Compl. ¶ 9.  The complaint then alleges that DFA discovered later that Estée Lauder had not raised its prices and that DFA "attempted to begin purchasing [Estée Lauder] products again."  *Id.* ¶ 13.  This sequence of events, as set out in the complaint, makes it clear that DFA terminated the relationship because it was unwilling to pay Estée Lauder's prices.  DFA can hardly complain that Estée Lauder conspired to exclude it from the market when it was DFA that ended the relationship, and Estée Lauder abandoned its planned price increase at DFA's urging (Compl. ¶ 11).  *See Lady Deborah's, Inc. v. VT Griffin Servs.*, No. CV207-079, 2007 U.S. Dist. LEXIS 95138, at *17-21 (S.D. Ga. Oct. 26, 2007) (dismissing § 1 claim in part because plaintiff ended the business relationship, and defendant "is free to choose with whom it will do business . . . .").

Insofar as the complaint suggests that Estée Lauder's objective in conspiring was to raise prices, it is bereft of any factual allegation suggesting an agreement among Estée Lauder and its

---

[5]  Estée Lauder has a legally protected right to choose its business counterparts.  It has been settled law for nearly a century that the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."  *United States v. Colgate Co.*, 250 U.S. 300, 307 (1919); *see also Monsanto*, 465 U.S. at 761; *Aquachem Co. v. Olin Corp.*, 699 F.2d 516, 520 (11th Cir. 1983) (affirming directed verdict because defendant's "unilateral refusal to deal with [plaintiff] was not a violation under Section 1" and plaintiff failed to show the existence of "concerted anticompetitive conduct by a plurality of actors").

retailers to set minimum resale prices, and it does not contain a resale price maintenance count.[6] At most, DFA alleges that Estée Lauder contemplated raising its *wholesale* prices, and "encouraged DFA (and *presumably* other duty-free store operators) to maintain margins and simply raise prices to consumers."  Compl. ¶¶ 9-10 (emphasis added).  This allegation does not even state that Estée Lauder agreed with anyone to raise retail prices.  This is a far cry from an agreement on "price or price level" at which retailers would resell a defendant's products, which Supreme Court precedent requires.  *Sharp*, 485 U.S. at 733.  And, of course, because DFA's objections allegedly convinced Estée Lauder *not* to raise prices, any attempt to "encourage[]" DFA to raise resale prices never came to fruition.  Compl. ¶¶ 9, 11.

Finally, DFA's allegation that the Newark letter constituted "anti-competitive and tortious activity" does not save its conspiracy claim.  Compl. ¶ 12.  The complaint does not allege that the letter inaccurately identifies Estée Lauder retailers.  And even if the letter implied by a very strained "negative inference" that DFA is not a "quality" retailer (Compl. ¶ 31), mere speech critical of a company does not violate § 1 unless it "leads to an agreement to restrain trade or is accompanied by some sort of 'enforcement mechanism'" that prevents the company from fairly competing.  *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011) (citing *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) (noting that the remedy for "false or misleading or incomplete or just plain mistaken" statements "is not antitrust litigation but more speech — the marketplace of ideas")); *see also Int'l Healthcare Mgmt. v. Haw. Coalition for Health*, 332 F.3d 600, 606 (9th Cir. 2003).

---

[6] Absent any allegations that a manufacturer and its distributors agreed on the prices at which distributors would resell its products, "a manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply," and "a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination."  *Monsanto*, 465 U.S. at 761.  Here, the complaint does not even allege that Estée Lauder had announced a resale price.

In short, Estée Lauder was free not to deal with DFA and to send letters that identified its authorized retailers, even if doing so diminished DFA's chances of winning airport concessions. The complaint does not allege any unlawful purpose that could support a claim for conspiracy under § 1 of the Sherman Act even if it had adequately pleaded an agreement.  DFA has failed to identify any illegal conduct to support its § 1 conspiracy claim.  It should be dismissed.

**B.      Because DFA's § 1 Conspiracy Claim Must Be Dismissed, Its § 2 Conspiracy Claim Must Also Be Dismissed.**

DFA also alleges that Estée Lauder conspired to monopolize in violation of § 2 of the Sherman Act.  "To establish a conspiracy to monopolize, a plaintiff must show: (1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy."  *Todorov v. DCH Health-care Auth.*, 921 F.2d 1438, 1460 & n.35 (11th Cir. 1991).  "Thus, a section 1 claim and a section 2 conspiracy to monopolize claim require the same threshold showing — the existence of an agreement to restrain trade."  *Id.*  Because DFA has failed to allege adequately the existence of "an agreement to restrain trade" under §1, its conspiracy claims under § 2 likewise must be dismissed.  *Id.* (affirming summary judgment on § 2 conspiracy claim because plaintiff had failed to support existence of conspiracy under § 1).

**C.      DFA's Attempted Monopolization Claim Fails Because It Does Not Identify Any Exclusionary Conduct.**

DFA's attempted monopolization claim fails because none of the three types of conduct that it alleges in support of its monopolization claim is anticompetitive.

The first is Estée Lauder's refusal to resume doing business with DFA after DFA terminated the parties' relationship.  But Estée Lauder has the right to choose the parties with which it deals.  *Colgate*, 250 U.S. at 307.  Although a narrow exception to *Colgate* is recognized where a monopolist terminates a profitable relationship with a competitor, DFA fails to plead the ele-

ments of this exception, which itself lies "at or near the outer boundary of § 2 liability." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004).  Among other things, DFA does not allege that Estée Lauder possesses monopoly power,[7] that Estée Lauder, as opposed to DFA, terminated the relationship, or that it is a competitor of Estée Lauder.  *See id.* at 407-10.  *See also Morris Comm's Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004); *Sunbeam Television Corp. v. Nielsen Media Res., Inc.*, 763 F. Supp. 2d 1341, 1350 (S.D. Fla. 2011) (even "a monopolist has no duty to assist its (potential) rival by dealing with it or providing it access to the monopolist's facility, especially where that rival can reasonably develop, on its own, the resource it seeks from the monopolist, or where the monopolist has acquired the resource through its own competitive and industrious effort . . . .").

The second factual linchpin for DFA's attempted monopolization claim is Estée Lauder's alleged disparagement of DFA.  But, just as truthful statements cannot support a claim of an unlawful conspiracy, they cannot satisfy the anticompetitive (or exclusionary) conduct element of a § 2 claim.  For "false and misleading" statements to rise to the level of "exclusionary conduct," they must "overcome a presumption that the effect on competition" of any allegedly false statement was de minimis.  *Am. Professional Testing Servs. v. Harcourt Brace Jovanovich Legal & Professional Publs.*, 108 F.3d 1147, 1152 (9th Cir. 1997); *see also Nat'l Ass'n of Pharmaceutical Manufacturers v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).  To overcome this presumption, a plaintiff must show that the statement was "[1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals."  *Harcourt*, 108 F.3d at 1152.  DFA has not alleged facts that could satisfy

---

[7] As shown in Part II, DFA does not even adequately plead that Estée Lauder has a dangerous probability of attaining a monopoly.

this test.  It has neither alleged that the *factual* content of this letter is false nor attempted to address the other elements of this test.

DFA's third claim is that Estée Lauder's acquisition of the Smashbox brand, for which it "obtain[ed] antitrust regulatory approval" (Compl. ¶ 16), and other unspecified brands was part of a scheme to acquire a monopoly (*id.*, ¶ 101).  This claim does not even attempt to describe the impact of the alleged acquisitions on the market beyond the innocuous, and insufficient, allegation that Estée Lauder made the acquisitions "to increase its market share" (*id.*).

**II.**  **The Complaint Should Be Dismissed for Failing to Define a Proper Relevant Market and to Allege Adequately the Existence of Market Power or a Dangerous Probability of Attaining a Monopoly.**

To state a claim under § 1 and § 2 of the Sherman Act, DFA must define the relevant market in which the competitive harm is alleged to occur.  To support a § 1 claim under the rule of reason, which is what the complaint alleges, DFA must allege sufficient facts to show that Estée Lauder possesses market power in that relevant market.  This is because a firm without market power cannot harm competition.  *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns.*, 376 F.3d 1065, 1073 (11th Cir. 2004).  To support a § 2 claim for attempted monopolization, DFA must allege sufficient facts to show that Estée Lauder has a dangerous probability of attaining a monopoly in that market.  Its complaint fails on each of these scores.

**A.**  **DFA Must Define a Relevant Market in Which Competitive Harm Occurs.**

Market definition is a critical element of both a § 1 and a § 2 claim.  2B Phillip E. Areeda et al., *Antitrust Law* ¶ 500, at 107 (2007 3d ed.) ("Areeda").  Although certain types of agreements are illegal *per se* under § 1 of the Sherman Act, DFA does not allege a *per se* unlawful agreement.[8]  Outside the narrow category of *per se* unlawful conduct, all § 1 claims are evaluated

---

[8]  *Per se* violations are "limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition.  Examples of such *per se* illegality include

under the rule of reason, which requires examining a restraint's competitive impact in a properly defined market. *See, e.g.*, *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996).

To establish attempted monopolization under § 2, a plaintiff must show a "dangerous probability that the defendant might have succeeded in its attempt to achieve monopoly power." *U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 993-94 (11th Cir. 1993) (citing *Spectrum Sports, Inc. v. McQuillan*, 456 U.S. 447, 455 (1993)). For a "dangerous probability" to exist, a defendant "must be close to achieving monopoly power." *Id.* "[D]efining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case." *Id.* at 994.

### B.  DFA Fails to Adequately Allege a Relevant Product and Geographic Market.

A plaintiff must define the relevant market in terms of the range of products that compete in the market and the geographic area within which the competition occurs. *Tempur-Pedic*, 626 F.3d at 1336 (§ 1); *U.S. Anchor Mfg.*, 7 F.3d at 994-95 (§ 2). A product market is "composed of products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered." *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). The relevant geographic market consists of "the area from which sellers of [the relevant product] derive their customers, and the area within which purchasers . . . can practically turn for such products or services." *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985); *see also Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1247 (11th Cir. 2002). The complaint must be "comprehensible" and "sufficiently particular to put the defendant on notice of the alleged market's boundaries." 2B Areeda, ¶ 531f at 236-37.

---

horizontal price fixing among competitors, group boycotts, and horizontal market division . . . ." *Tempur-Pedic*, 626 F.3d at 1334.

## 1.   DFA Fails to Define a Proper Product Market.

Estée Lauder manufactures beauty products and sells them to downstream customers, including airport duty-free stores and department stores.  The relevant product market in which Estée Lauder competes must be identified by looking to the producers that provide these retailers with products that compete with Estée Lauder's beauty products.  This is because the product market includes those "producers that provide customers of a defendant firm (or firms) with alternative sources for the product or services."  *Levine*, 72 F.3d at 1552; *see also Tempur-Pedic*, 626 F.3d at 1337; *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 294 F. Supp. 2d 1291, 1306-07 (M.D. Fla. 2003); *see also* Areeda ¶ 530a at 225.

The complaint alleges that Estée Lauder has harmed competition "at the beauty product manufacturing level."  Compl. ¶ 17.[9]  It fails, however, to define this market.  It attempts to define only a *retail* market, which consists of beauty products sold by airport duty-free stores to "international travelers."  *See* Compl. ¶¶ 79, 81.  Even if this were a plausible market, it would only be a market in which *DFA* competes (and has a monopoly as the sole distributor of beauty products in a particular airport terminal).  The complaint fails to provide any description of, let alone the factual details that could support a definition of, the market in which Estée Lauder competes.  The complaint makes clear that many suppliers and brands of beauty products are present in the market, and avers that DFA itself sells brands that compete with Estée Lauder's

---

[9]  The Complaint also alleges harm to "competition at the bidding level for RFPs" for airport retail concessions (Compl. ¶ 104), but it fails to define the market for such concessions, which fatally dooms the claim.  The complaint also fails to allege that Estée Lauder possesses market power in any such market.  Its only allegation of market power is based on Estée Lauder's "market share in the relevant market of approximately 50% or greater," which necessarily refers to Estée Lauder's share in the alleged market for beauty products sold through airport duty-free stores.  Indeed, the complaint does not even allege that Estée Lauder participates in any putative market for airport bidding.  Moreover, Estée Lauder may not be held liable for harm to competition in a market in which it does not compete.  *Uniforce Temp. Pers., Inc. v. Nat'l Council on Compensation Ins., Inc*., 87 F.3d 1296, 1301 (11th Cir. 1996).

brands (*id.* ¶ 16), but it does not identify any of Estée Lauder's competitors, their products, or the attributes of their products.  These defects are fatal to DFA's complaint.

While the complaint contains conclusory allegations that beauty products sold in duty-free stores are not interchangeable with the same products sold elsewhere, it avers no *facts* that support this claim.  Insofar as the complaint offers any facts, it actually demonstrates that beauty products sold across different distribution channels are interchangeable in both price and quality.

With respect to price, the Eleventh Circuit emphasized in *Tempur-Pedic* that "[a] court should pay particular attention to evidence of the cross-elasticity of demand and reasonable sub-stitutability of the products, because '[i]f consumers view the products as substitutes, the products are part of the same market.'"  626 F.3d at 1337-38 (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)).  Insofar as the complaint touches on cross-elasticity, it indicates that the market is far broader than beauty products sold at duty-free stores, because it alleges that Estée Lauder's wholesale price increase to duty-free stores would have had the "effect of diminishing the duty free industry's [pricing] advantage" (Compl. ¶ 26).[10]

The Eleventh Circuit also emphasized in *Tempur-Pedic* that "[m]ost importantly, we should look 'to the uses to which the product is put by consumers in general.'"  626 F.3d at 1337 (quoting *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1221 (11th Cir. 2002)).  As to this most important aspect of interchangeability, the complaint alleges that "[b]eauty products

---

[10]   DFA's allegation that suppliers offer lower wholesale prices to duty-free retailers does not support DFA's market definition both because of the high cross-elasticity of prices between the department store and duty-free channels that its own complaint depicts and because "for identical items, a price differential alone does not establish two separate product markets."  *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 615 (8th Cir. 2011).  *See also Tempur-Pedic*, 626 F. 3d at 1338 (finding allegation that foam mattresses were more expensive than traditional mattresses "of little help" in establishing a separate market for foam mattresses); *HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) (price differential between two similar products insufficient to support separate markets for them).

sold in department stores" are "functionally identical" to the beauty products "sold in duty free stores."[11]  The complaint does not (and cannot) state that customers do not view the products sold through the different channels as interchangeable.

DFA attempts to distinguish the duty-free products sold in duty-free stores from those sold in department stores with an allegation that "[d]uty free customers in the United States are outbound international travelers" who "are severely restricted from trying to leave the airport to visit a traditional retail store and then returning."  Compl. ¶ 81.  But even if the retail customers who buy from DFA are captive to DFA, DFA itself is not captive to any of its suppliers.  DFA confuses its customers' suppliers (i.e., itself) with the suppliers from which it buys.  Only the latter are relevant to the definition of the product market, and its complaint ignores them.

### 2.     The Relevant Geographic Market Cannot Plausibly Be Limited to Duty-Free Stores at Airports.

DFA's alleged geographic market suffers from the same flaws as its alleged product market.  DFA alleges that the relevant geographic market is "duty free stores at airports serving international travelers in the United States."  Compl. ¶ 85.  Again, DFA defines the market in terms of its *customers*, when the relevant market is the one in which its *suppliers* compete.  "A geographic market is the area in which consumers can practically turn for alternative sources of the product and in which the antitrust *defendants face competition . . . .*"  *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999) (emphasis added).  The scope of this market is

---

[11]   DFA also alleges that "most" beauty product manufacturers "have distinct divisions devoted solely to 'travel retail' sales."  Compl. ¶ 80.  But merely having a sales team dedicated to a channel of distribution falls far short of suggesting that the manufacturers supplying the different channels do not compete across them, particularly when the products sold into two channels are alleged to be identical.  DFA also alleges that "[a]irport duty free stores use a specialized vendor model, implement unique layouts, and offer a distinct array of merchandise than other retail stores that sell beauty products."  Compl. ¶ 83.  But the question is not whether these stores are distinct from retail stores, but whether "beauty products sold in airport duty free stores" are distinct from the beauty products sold into other stores.

defined by the geographic areas from which manufacturers sell the relevant products and retailers buy them.  *Id.*  Again, even if international travelers are held "captive" at airports, DFA is not held captive at any airport when it orders from suppliers.[12]

DFA's failure to plead facts "plausibly suggest[ing] the contours of the relevant geographic and product markets" of beauty products sold by manufacturers to duty-free retailers at airports dooms its complaint.  *See Tempur-Pedic*, 626 F.3d at 1336.

### C.    DFA's Complaint Fails to Allege Sufficiently Estée Lauder's Possession of Market Power or a Dangerous Probability That It Will Attain Monopoly Power.

#### 1.    DFA Does Not Plausibly Allege the Existence of Barriers to Entry.

Even if DFA had pled a proper market definition, its complaint would fail because it does not adequately plead the existence of barriers to entry into the relevant market.  Without barriers to entry, a defendant cannot possess market or monopoly power because new entrants into the market would defeat any attempt to exercise this power.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 119 n.15 (1986) ("without barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 591 n.15 (1986)); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde¸* 466 U.S. 2, 38 (1984) (concurring opinion) (no threat of market power "if entry barriers in the tied product market are low"); *Bailey v. Allgas, Inc.,* 284 F.3d 1237, 1256  (11th Cir. 2002) ("Where a market has low barriers to entry, sellers charging supracompetitive prices

---

[12]  In any event, courts have been skeptical of similar claims that a distinct geographic market is created whenever consumers are held "captive" for a brief period of time.  *See, e.g.*, *Elliott v. United Center*, 126 F.3d 1003, 1005 (7th Cir. 1997) (dismissing complaint alleging that sports complex could have unlawful monopoly on food products sold as concessions at the arena, despite potential for captive consumers).  Here the argument for a "captive" market is even weaker because unlike food sold at a sports arena, beauty products are not consumed on the premises where they are sold.  Further, this market definition depends on the questionable premise that customers can only purchase a particular beauty product during the transitory time period in which a customer is waiting for a departing international flight.

will soon attract new competitors"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (rejecting § 1 claim where plaintiff did not demonstrate "significant barriers to entry" in the relevant market).

While DFA attempts to make factual allegations that barriers to entry exist (Compl. ¶ 70), other allegations in its complaint completely rebut this claim.  For example, the complaint alleges that when the Smashbox brand was independently owned, "DFA promoted and sold Smashbox" and "develop[ed] significant demand for that brand."  *Id.* ¶ 16.  The complaint further alleges that, after DFA stopped buying from Estée Lauder, DFA "introduce[d] and develop[ed] . . . more brands" that "did and would compete with [Estée Lauder] brands" and "had not previously been introduced into duty free stores in U.S. airports."  *Id.*  And DFA's allegation that "there has been *relatively little* recent change at the top in the major manufacturers of beauty products marketed and sold in duty free stores" (*id.* ¶ 70 (emphasis added)) suggests that there has been *some* recent change at the top of this alleged market and that even more changes may have occurred below the very top tier of competitors.  These allegations suggest that entry and upward mobility have occurred within the alleged market defined by DFA. They are incompatible with the existence of barriers to entry, and doom DFA's § 1 conspiracy and § 2 attempted monopolization claims.

## 2.    DFA's Market Share Allegation Is Insufficient.

To establish a "dangerous probability that the defendant might have succeeded in its attempt to achieve monopoly power," which an attempted monopolization plaintiff must do, the defendant "must be close to achieving monopoly power."  *U.S. Anchor Mfg.*, 7 F.3d at 993-94. In the Eleventh Circuit, a defendant's market share must be *at least* 50 percent of the relevant market to meet this standard.  *Id.* at 1000 ("a dangerous probability of achieving monopoly power may be established by a 50% share") (emphasis omitted); *see Allgas*, 284 F.3d at 1250

("A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power.").  The most that DFA can muster is that Estée Lauder's market share in the improperly defined market is "*approximately* 50% or greater."  Compl. ¶ 133 (emphasis added).  DFA thus does not even allege the minimum market share necessary to allege a "dangerous probability," and thus fails yet another pleading hurdle that it must overcome in a § 2 case.[13]

### III.     DFA's Tortious Interference Claim Must Be Dismissed Because DFA Fails to Allege an Existing or Prospective Agreement and Unjustified Interference.

Under Florida law, a claim for tortious interference with a prospective business relationship requires that a plaintiff allege "an actual and identifiable understanding or agreement which *in all probability would have been completed* if the defendant had not interfered."  *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) (emphasis added).[14]  DFA's conclusory and speculative assertion that it "enjoyed an existing, prospective, or both, advantageous business relationship with the Newark, Boston and Orlando Airport Authorities" woefully fails to satisfy its pleading obligation.  Compl. ¶ 137.  DFA's complaint is devoid of any allegation of "actual and identifiable agreement[s]" to operate duty-free retail concessions in the Newark, Boston, or Orlando airports "which in all probability would have been completed" but for Estée Lauder's alleged interference.  *Ethan Allen*, 647 So. 2d at 815.

Further, even if DFA could identify such a probable agreement, it has failed to allege facts indicating that Estée Lauder intentionally and unjustifiably interfered with it.  *Id.* at 814.

---

[13]  DFA's claim that Estée Lauder's products are "must have" brands for any airport duty-free store (Compl. ¶ 95) does not advance DFA's case.  Merely because a retail store must carry a particular brand, such as Crest toothpaste, it does not follow that the brand has a monopoly or near monopoly when there are readily available substitutes, such as Colgate.

[14]  DFA does not specify the specific tortious interference law under which it brings its action. We assume here that it has elected to proceed under the law of the forum state, Florida, but the choice of law should not affect the disposition of the motion given the absence of wrongful conduct.

"[L]awful competitive practices are privileged under Florida tortious interference law," and thus so long as "[a defendant's] conduct is not wrongful or illegal, it is justified." *Pandora Jewelers 1995 v. Pandora Jewelry, LLC*, No. 09-61490-Civ., 2011 U.S. Dist. LEXIS 59465, at *15 (S.D. Fla. June 2, 2011) (quoting *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1364 (S.D. Fla. 1998)) (alteration in original).   DFA makes the conclusory allegation that Estée Lauder's communications to airport authorities contained "disparaging statements and innuendo" (Compl. ¶ 139), but it does not allege any *facts* to dispute the factual accuracy of the alleged communications.   Moreover, the only such communication that it alleges other than on the basis of rank speculation reveals no disparaging, let alone untruthful, content.  *See* Compl., Ex. B.

Finally, DFA fails to allege a sufficient causal link between Estée Lauder's alleged conduct and its loss of prospective business relationships in connection with the Boston and Orlando bids cited in its complaint, as required to support its claim.  *See St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 504 (Fla.  5th DCA 2001).   The complaint does not allege that Estée Lauder "induc[ed] or otherwise caus[ed]" the Boston and Orlando airport authorities to reject DFA's bids.  *Id.* at 505 (quoting *Gossard v. Adia Servs., Inc.*, 723 So. 2d 182, 184 (Fla. 1998)).  Rather, it merely states that DFA's Boston bid was rejected "at least in part" because of Estée Lauder's conduct (Compl. ¶ 45), which it pleads on information and belief (*id.* ¶ 41).   Similarly, the complaint identifies DFA's inability to supply Estée Lauder products, and *not* Estée Lauder's interference, as the reason for DFA's failure to win the Orlando airport bid.  Compl. ¶ 55.  The conduct alleged by DFA constitutes neither inducement nor causation.  *See St. Johns*, 784 So. 2d at 505.

## CONCLUSION

For all of these reasons, Estée Lauder respectfully requests the Court to issue an order dismissing DFA's complaint.

Dated:   June 15, 2012               By:  s/  *Charles M. Rosenberg*

 

Charles M. Rosenberg (FL Bar # 279064)
Email: crosenberg@carltonfields.com
Aaron S. Weiss (FL Bar # 48813)
Email: aweiss@carltonfields.com
Carlton Fields, P.A.
100 Southeast Second Street, Suite 4200
Miami, Florida 33131
Telephone No. (305) 530-0050
Facsimile No.   (305) 530-0055

 

Robert C. Walters *(pro hac vice pending)*
Email: rwalters@gibsondunn.com
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone No. (214) 698-3114
Facsimile No.   (214) 571-2900

 

Joseph Kattan, PC *(pro hac vice pending)*
Email: jkattan@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone No. (202) 955-8239
Facsimile No.   (202) 467-0539

 

*Attorneys for Defendant The Estée Lauder Companies, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2012 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Aaron S. Weiss*
Aaron S. Weiss

Elliot R. Golding
Email: egolding@crowell.com
Mark A. Klapow
Email: mklapow@crowell.com
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202-624-2500

Gabriel Groisman
Email: ggroisman@coffeyburlington.com
Paul Joseph Schwiep
Email: pschwiep@coffeyburlington.com
Coffey Burlington Wright Crockett et al
2699 S. Bayshore Drive, Penthouse A
Miami, FL 33133
Telephone: 305-858-2900
Telefax: 305-858-5261

*Attorneys for Plaintiff Duty Free Americas, Inc.*