## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-60741-Civ-SCOLA

DUTY FREE AMERICAS, INC.,

     Plaintiff,

vs.

THE ESTÉE LAUDER COMPANIES, INC.,

     Defendant.

_____/

# Order Granting Motion To Dismiss

     This is primarily an antitrust case.  Plaintiff Duty Free Americas, Inc. (DFA) operates duty-free stores in airports and one of the main products it carries is beauty products.  Defendant The Estée Lauder Companies, Inc. (ELC) supplies many duty-free stores with its beauty products, but it no longer deals with DFA.  DFA alleges in its Amended Complaint (ECF No. 143) that ELC attempted to monopolize the market for beauty products in duty-free stores in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; that ELC tortiously interfered with DFA's prospective business relationships with three airports under Florida law; and that ELC engaged in contributory false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  ELC moved to dismiss all these claims for failure to state a valid claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (ECF No. 160.)  For the reasons set forth below, the Court **grants** ELC's Motion (ECF No. 160) and **dismisses** DFA's claims.  Because the Court previously granted ELC's motion to dismiss DFA's original Complaint, and because the original Complaint contained antitrust claims and a tortious-interference claim, DFA has already had an opportunity to amend these claims.  Moreover, DFA's Amended Complaint came after it obtained tens of thousands of documents from ELC.  Because DFA has already had an opportunity to amend its antitrust and tortious-interference claims but has failed to state valid claims even after obtaining extensive discovery, the Court concludes that any further amendment of these claims would be futile. The Court therefore **dismisses** these claims **with prejudice**.  The Lanham Act claim in DFA's Amended Complaint is a new claim.  So the dismissal of DFA's current claims is **without prejudice**.  But given DFA's failure to state a valid claim after obtaining extensive discovery and having two chances to state a

valid claim, the Court cautions DFA to be mindful of its Rule 11 obligations in repleading this claim or bringing a new claim.

## Background

Most international travelers are familiar with duty-free stores.  They are retail outlets located in airports' (and seaports') international terminals, typically offering a distinct assortment of luxury goods—like alcohol, jewelry, and beauty products—to outbound international travelers.  "Duty-free" stores get their name from the fact that their customers do not pay certain sales taxes or import duties on purchases in their stores.  This gives them a reputation for offering luxury goods at lower prices and on favorable terms.  And it is this perception that drives consumer demand.

ELC is the largest manufacturer of beauty products[1] sold in duty-free stores in U.S. airports; ELC's market share is "approximately 50% . . . and growing in the relevant markets."  (ECF No. 143 at 46.) DFA defines the relevant markets as beauty products and cosmetic products that are sold in U.S. airport duty-free stores.  (*Id.* at 45.)  With respect to beauty products, DFA alleges only an approximate percentage for ELC's market share (i.e., approximately 50% and growing).   With respect to cosmetics, the only nonapproximate, nationwide percentage alleged for ELC's market share is 45.71% in 2010.  (ECF No. 143 at 13.)  Specific percentages above 50% are alleged only for skin-care products, which is but a subset of cosmetics.

DFA is one of around ten major duty-free-store operators in the U.S.  It currently operates duty-free stores in the following U.S. international airports: JFK, LaGuardia, Detroit, Dulles, Miami, Atlanta, Baltimore, and Charlotte. DFA is a self-described "innovator" in the duty-free industry, particularly when it comes to its prices, product displays, and beauty-products brands.  (*Id.* at 14.) While most duty-free operators generally offer the same lineup of brands— which includes brands that compete with ELC—DFA also sells new and innovative brands (like Perry Ellis and Jennifer Aniston) that compete with the incumbent brands (like ELC's).

Duty-free operators, such as DFA, generally secure space to operate duty-free stores in a particular airport via a competitive bidding process initiated by a request for proposal (RFP).  For example, an airport will generally issue an RFP to operate duty-free stores in its international terminals, typically

---

[1] DFA defines *beauty products* as "goods used to enhance appearance or smell" and further subdivides beauty products into the three subcategories of makeup, skincare, and fragrances.  (ECF No. 143 at 8.)  *Cosmetics* is the industry term for makeup and skincare products.

for a term of five to ten years.  Duty-free operators then submit proposals to the airport detailing certain information, such as the products they carry, and the amount of "rent" (typically a minimum annual guarantee (MAG) and a percentage of sales) that they will pay to the airport in exchange for the duty-free concessions.  With some exceptions, an airport generally awards all of its duty-free concessions to only one duty-free operator.

DFA and ELC maintained a business relationship until sometime before June 2008.  ELC would sell its beauty products to DFA at wholesale "travel retail" prices[2]—which were lower than traditional retail wholesale prices—and DFA would then add a markup and retail the products in its stores across the U.S.  During that time, ELC instructed DFA and its competitors (i.e., other duty-free operators) on the suggested retail price for ELC products sold in their stores.  Duty-free operators (including DFA when it had a relationship with ELC) adhered to these suggested retail prices.

ELC also instructs duty-free operators on the quality and quantity of display space to be allocated to its beauty products in their duty-free stores.  As a condition of carrying ELC products, ELC requires duty-free operators to carry the full line of products within a brand, not just the popular ones (hereafter referred to as full-line forcing); carry ELC fragrances as a condition of carrying ELC makeup or skincare products (hereafter referred to as tying); carry excess ELC inventory; and provide ELC with a large quantity and quality of display space.  ELC has routinely threatened duty-free operators to stop doing business with them if they did not accede to these demands.  When DFA and ELC had a business relationship, ELC made similar demands of DFA, but DFA pushed back against these demands harder than other operators and thus was more successful in resisting them.

In January 2007, ELC announced that "effective April 1, 2008 [its] Travel Retail Suggested Price . . . [would] change to U.S. Domestic Suggested Retail Price." (ECF No. 143, Ex. 1.)  DFA strongly objected to this price increase and was able to thwart the full extent of the price increase.  Sometime after this, DFA terminated the business relationship and stopped buying ELC products.[3]

Sometime after DFA terminated the business relationship, it reconsidered and asked to once again buy products from ELC.  But this time ELC refused DFA's requests.  So DFA began devoting the display space it had

---

[2] These wholesale prices to duty-free operators are based on a discount of the suggested retail price.  So when ELC increased its suggested retail price in 2008, the prices duty-free operators had to pay increased as well.

[3] Although DFA's Amended Complaint is noticeably silent on who terminated the business relationship, DFA's attorney admitted at the hearing on ELC's motion to dismiss that it was DFA that terminated the relationship, not ELC.

previously used for ELC's brands to introduce new beauty product brands in its duty-free stores, many of which had not been sold before in U.S. duty-free stores.  For example, DFA introduced and developed a significant demand for a new beauty product brand—Smashbox.   In 2010, however, ELC acquired Smashbox after obtaining antitrust regulatory approval for the deal.  It then ceased supplying Smashbox to DFA.  DFA has tried to negotiate future sales of Smashbox, but to no avail.

## A.    Relevant Airport RFPs
### 1.    The Newark RFP

In December 2008, an RFP was issued to lease and develop duty-free concessions at Newark Liberty International Airport (Newark Airport) for a new seven-year term.   DFA and three other duty-free operators—International Shoppes (ISI), Dufry, and EJE—submitted bids.  These other operators all had a relationship with ELC and sold ELC products.   About three weeks later, before the final bids were submitted, ELC's President of Travel Retailing Worldwide, Olivier Bottrie, sent an unsolicited letter to Ms. Judy Tuttle, the leasing agent who managed the RFP process for Newark and other airports. The letter highlighted and promoted ELC's authorized duty-free retail partners:

> Dear Ms. Tuttle:
> In the context of a tough economy and fears of a prolonged recession, suppliers depend on, and need to rely on, the quality of their authorized retailer partners.
>
> The Estée Lauder Companies are proud to have established strong and mutually beneficial commercial relationships with, and only with, the following landed retail partners in the United States of Americas:
>
> -        Alpha Keys
> -        Ammex
> -        DFASS
> -        DFASS-Nuance
> -        DFS Group
> -        DUFRY
> -        EJE
> -        HMS-Host
> -        International Shoppes
> -        Nuance

We are confident that each of these authorized retailers brings the expected quality of in-store execution and required operational excellence necessary to represent our brands and service your valued passengers.

Sincerely,

[Signed, Olivier Bottrie]

(ECF No. 143, Ex. 9.) DFA's bid was ultimately rejected and Dufry was selected. The Deal Approval Request form ranked the bidders in this order: Dufry, ISI, DFA, and EJE. The form made the following comments about how it scored the bids: "Dufry had strongest financial proposal and strongest financial position[;] International Shoppes had strong customer service and operations[;] EJE . . . did not have strong financials[;] Duty Free Americas does not have the rights to sell Estée Lauder brands." (*Id.*, Ex. 10.)

## 2.   *The Boston RFP*

Two and a half years later, in May 2011, an RFP was issued to lease and develop duty-free concessions at Boston Logan International Airport (Boston Airport) for a new seven-year term. At that time, DFA had been the incumbent at Boston for the prior 16 years and had doubled sales during its tenure. DFA submitted a bid, along with two of its competitors, ISI and Dufry, both of whom could sell ELC products. During the RFP process, ELC informed Airmall, the contractor running the RFP process, that ELC did not deal with DFA.

ISI was selected to operate the duty-free store. DFA came in second and Dufry finished third. A memo from an Airmall official outlined the process and reasoning used in selecting ISI over DFA and Dufry. Officials from Airmall traveled to JFK International Airport to visit both DFA and ISI stores to view their operations and "the build out of each operator." (*Id.*, Ex. 12.) The two major factors in selecting ISI over DFA was that (1) ISI sold ELC products while DFA did not, and (2) ISI's minimum annual guarantee (MAG) was greater than DFA's over the life of the agreement. (*Id.*) In addition, the memo implied that ISI will invest more money into the space the DFA. Airmall was also impressed with ISI being a family-owned business that has been operating over 60 years, that has a "proven track record a JFK," and that "continue[s] to grow at that location." (*Id.*)

## 3.   *The Orlando RFP*

In August 2011, an RFP was issued to lease and develop duty-free retail concessions at Orlando International Airport (Orlando Airport). But this time DFA partnered with Stellar, a local company that operated duty-free stores at Tampa International Airport (Tampa Airport), to submit a joint bid for the duty-free concessions at the Orlando airport. The other bidders were Dufry, Heinemann (through a local partner, "Travel Retail"), World Duty Free (WDF), and a joint venture between Nuance and DFASS. All of the other bidders could sell ELC. In October 2011, Dufry wrote to Bottrie asking ELC whether each of the bidders was an authorized direct customer of ELC and if not, whether ELC anticipates selling ELC products to that party should they win the Orlando duty-free concession. (*Id.*, Ex. 13.) Later that same month, Dufry wrote to Bottrie asking him to confirm that DFA no longer carries ELC brands. (*Id.*, Ex. 14.) At the end of October, Bottrie wrote to Phillip Brown, the Executive Director of the Greater Orlando Aviation Authority, and informed him that ELC had direct commercial relationships with only Dufry, Heinemann, WDF, Nuance, and DFASS. (*Id.*, Ex. 15.) After receiving this letter, Brown contacted Bottrie, who confirmed that ELC would not sell product to DFA or Stellar, but would sell to the other bidders. (*Id.*, Ex. 17 at 2.)

A provisional award was made to the Nuance/DFASS joint venture. He bidders were ranked in this order: Nuance/DFASS, DFA, Travel Retail, Dufry, and WDF. DFA and Travel Retail appealed the rankings recommending that Nuance/DFASS win the duty-free/duty-paid concession. An appeal hearing before the Orlando Airport Authority was conducted on November 15, 2011. The appeal hearing did not change the outcome: Nuance/DFASS won the concession. But because the hearing and the decision by Brown bear directly on several of ELC's claims, the Court provides some detail about the results of the hearing.

One matter addressed at the hearing was the representation made by DFA and Stellar in their bid that they would be able to sell ELC products. DFA's bid proposal listed a "significant number of Estée Lauder brand items to be sold as part of the concession." (*Id.* at 8.) In addition, the proposal stated that the products DFA would carry in Orlando—which included ELC products—were a subset of the products DFA carries in its JFK and Miami Airport locations. The proposal thus implied that DFA sold ELC products in JFK and Miami. And DFA's promotional brochure that it provided with its proposal had photographs of DFA stores displaying "Clinique" and "Estée Lauder" signage and products. (Clinique is an ELC brand.) Under the text heading, "DFA Name Brands," the DFA brochure includes both Clinique and Estée Lauder. (*Id.*) Finally, during the interviews as part of the RFP process, DFA was asked, as were all the other bidders, "do you have a direct

merchandise purchasing relationship with all the brands you are offering?" (*Id.* at 8-9.)  Both DFA representatives responded "yes." (*Id.* at 9.)  But of course DFA did not have a direct purchasing relationship with ELC at that time, as Brown had confirmed with ELC.

So Brown asked DFA to address this issue at the appeal hearing.  Both DFA and Stellar admitted at the hearing that "they do not have a relationship with Estée Lauder and do not carry Estée Lauder products in any of their existing stores.  They have not carried Estée Lauder for some time." (*Id.*)

Stellar attempted to address these inconsistencies by stating that DFA never represented that it would carry ELC products.  Their bid proposal instead simply claimed that ELC products would be offered only at the duty-free store run by Stellar.[4]  Thus, Stellar was the only one representing that it would carry ELC brands.  (*Id.*)  Brown rejected this explanation.  ELC products "were repeatedly listed in DFA's brochure, photographs, and proposal." (*Id.*)  Moreover, DFA's proposal did not separate out the merchandise list by each particular store that would be operated within the Orlando Airport.  (*Id.* at 8.)  Brown concluded thus:

> I do not accept DFA's explanation for DFA misrepresenting that it carried Estée Lauder products in Miami and JFK and would carry them in Orlando.  At best, DFA's proposal, brochure, photographs, and CPC interview were misleading.  Such ambiguous word play is not conducive to a mutually beneficial business relationship.

(*Id.* at 9.)

In an attempt to explain why Stellar thought it would be able to offer ELC products, Susan Stackhouse, an official at Stellar, provided the following explanation at the hearing: in the past, Stellar had been a direct customer of ELC and sold ELC products at Stellar's duty-free store at the Tampa Airport. (ECF No. 160-1 at 6.)  When the airport downsized, Stellar's stores were relocated to smaller locations that could not accommodate the space ELC required.  So Stellar stopped buying from ELC directly and instead purchased some ELC products from a wholesaler.  (*Id.* at 6-7.)  That arrangement lasted for a while, but eventually Stellar stopped selling ELC products at the Tampa Airport altogether.  (*Id.* at 7.)  Then, a few years before the November 2011

---

[4] DFA's Amended Complaint alleges that "DFA/Stellar listed ELC brands in the Orlando bid with respect to the duty free store to be operated by Stellar." (ECF No. 143 at 25.)  Given that this factual allegation is undercut by an Exhibit DFA attaches to its own Amended Complaint, and given that Brown rejected this precise explanation after giving DFA and Stellar a formal opportunity to address this issue at an appeal hearing, the Court need not—and does not—accept this particular "factual" allegation by DFA.

appeal hearing, Stackhouse, who served on the board of IAADFS, had a conversation with Israel Assa, an ELC official, at an event hosted by duty-free operators where vendors were invited.  During the dinner, Stackhouse told Assa that Stellar was interested in purchasing ELC.  Stackhouse represented that Assa assured her that if Stellar had stores that were large enough to accommodate the space ELC required or if Stellar won a larger contract, that ELC would sell to Stellar again.  Based on this conversation, Stackhouse felt that there was no reason that Stellar would be denied a relationship with ELC for the Orlando airport.  But in response to direct questions, Stackhouse admitted that although she told the Orlando Airport officials during the interview that Stellar had a direct merchandising purchasing relationship with all the brands listed in her proposal—which includes ELC—she had had only a past relationship with ELC and was not currently buying from ELC.  Based on Bottrie's letter to the Orlando Airport and Brown's conversation with Bottrie, Brown stated at the hearing that ELC's position was that it had no relationship with Stellar and no intent to sell to Stellar if DFA and Stellar won the concession.

Another important finding Brown made after the hearing was that DFA's sales projections for the Orlando airport—which were significantly higher than sales projections of Nuance and Travel Retail—were overstated and not reasonably attainable.  (ECF No. 143, Ex. 17 at 5.)  One factor in Brown reaching this conclusion was that DFA's "inability to offer the Estée Lauder family of brands represents, in my view, a substantial deficiency in their cosmetic and fragrance product mix that will adversely impact DFA's sales projections.  The other proposers do not suffer from such a significant product deficiency."  (*Id.*)  But there were other factors that led to this conclusion besides DFA not being able to sell ELC products.  For example, Brown found that DFA's performance at its other airport duty-free stores did not support DFA's sales projections at the Orlando Airport.  (*Id.* at 3.)  DFA identified its duty-free operations at Miami Airport as being one of the two most comparable to the Orlando Airport, and yet DFA projected to spend 22% less per square foot in developing the Orlando duty-free store space than it spent developing Miami, but still projected that its Orlando operations would earn 61% more revenue per square foot than its Miami operations.  (*Id.*)  And DFA's projected sales exceeded that projected by the independent consultant retained by the Orlando Airport to help it evaluate the reasonableness of the bid proposals.

Brown also identified other problems with DFA's proposal that prevented it from accurately projecting DFA's performance in Orlando.  DFA erroneously included Stellar's profits as its own profits.  And DFA's proposal omitted that DFA would be subsidizing Stellar's operations because DFA will pay more fees

to the airport authority for the concession that Stellar would operate than DFA would receive from Stellar as a subconcession fee. (*Id.* at 5.) And assuming that DFA only achieved the sales projections of Nuance—which had the next highest sales projections, but still exceeded the sales projected by the consultant retained by the Orlando Airport—DFA would actually suffer significant losses because of its high concession fees to the Airport. Brown saw this as a real risk:

> The combination of DFA's proposed high concession fee percentages, aggressive sales projections, inability to carry the same products available to the other proposers, and the cost of paying to supplement the Stellar sublease concession fee, call into question the capability of this operator to sustain a financially viable concession that meets the expectations of the traveling public. The Authority has experience with concessions where overly aggressive proposals resulted in the operator abandoning the store or cutting staff and stock to minimize losses.

(*Id.* at 6.) And Brown exposed the flaw in DFA's argument that its fee to the Airport would be higher than the other bidders even if its sales projections were unrealistic because the percentage of its sales that it paid to the airport were greater than the percentages paid by the other bidders. The flaw is simple: if a bidder with a smaller percentage paid to the airport sells more than DFA, then the total amount paid to the airport could exceed what DFA pays.[5]  (*Id.* at 5.) And Brown was worried that the risk that DFA would lose money in Orlando could lead DFA to cut staffing and carry an inadequate level of high value inventory to minimize losses, which in turn could negatively affect its sales. (*See id.* at 5-6.)

Nuance and Travel Retail also appeared at the appeal hearing. Both Nuance and Travel Retail criticized DFA's sale projections as being unreasonable given DFA's past performance and the projections of the consultant the Orlando Airport hired. (ECF No. 160-1 at 41-43, 63, 69.) And Nuance and Travel Retail also characterized awarding the concession to DFA as a risk, primarily because of the greater chance that DFA's operations would not be profitable. (*Id.* at 50, 69-70.) Nuance stated that ELC products are a key

---

[5] DFA alleges in the Amended Complaint that the "DFA/Stellar bid proposed to pay millions of dollars more in rent than any other bidder over the life of the contract." Given the persuasive logical reasoning on Brown on this very point, the Court accepts that if DFA sold the same amount as other operators, then DFA would pay more to the Orlando Airport. But for the reasons outlined by Brown, it is plausible that another bidder could pay as much or more to the Orlando Airport over the life of the contract by selling more than DFA does.

component of a duty-free store and highlighted that its proposal included a letter from ELC stating that ELC would supply Nuance's Orlando duty-free operations if Nuance won the bid.  (*Id.* at 63-65.)

Following the hearing, Travel Retail sent another letter to the Orlando Airport arguing its case.  Travel Retail again highlighted that DFA projected 43% more sales than the consultant the Airport hired to evaluate the proposals. (ECF No. 143, Ex. 1 at 2.)  Travel Retail also urged the Airport "not to underestimate the significance of Estée Lauder . . . in evaluating DFA's sales projections." (*Id.* at 3.)  Travel retail cited information received directly from ELC, showing that ELC's market share was 37% in skin care, 24% in make-up, and 22% in fragrances in the U.S. domestic market.  (*Id.*)

As previously noted, the duty-free concession was awarded to Nuance. Brown issued the appeal decision on January 10, 2012.

### 4.    *The Atlanta RFP*

In July 2011, an RFP was issued to lease and redevelop duty-free retail concessions at the Hartsfield-Jackson Atlanta International Airport (Atlanta Airport) for a seven-year term, with an option for a three-year renewal.  The RFP was designed as a sealed RFP, meaning that the identities of the potential bidders would not be known until bids were submitted.  DFA submitted a bid, as did WDF,[6] Dufry, and Nuance.  All the other bidders sell ELC products.

In early November 2011, Atlanta's Chief Procurement Officer, Adam Smith, notified the other bidders that a recommendation of award would be made to DFA.  Later in November, Nuance emailed Bottrie and asked that ELC "identify, from among the Proposing Parties, or any of their known affiliates, those with whom you currently have a direct commercial relationship, or with whom you will consider opening a direct commercial relationship in the event such party is awarded [the Atlanta duty-free] concession contract." (ECF No. 143, Ex. 19 at 2.)  Bottrie emailed back and confirmed that ELC had direct relationships or would consider having direct relationships with the three non-DFA bidders.  (*Id.*)  Nuance then requested that Bottrie place this information on ELC letterhead and provide that to Nuance.  Bottrie declined, stating that if officials from the Atlanta Airport asked him directly, that he would confirm the information for them.

On December 21, 2012, Larry Dingle, an attorney for an undisclosed Atlanta Airport bidder, wrote to Atlanta about the relationship between DFA and ELC and provided Bottrie's contact information and a list of ELC brands.

_____

[6] Technically, the bid was submitted by Aldeasa, which is a subsidiary of Autogrill.  World Duty Free (WDF) is a trading name of Autogrill.

The letter also informed Atlanta about DFA recently misleading Orlando Airport officials during the Orlando RFP process by claiming that DFA would sell ELC products and that DFA had a direct merchandise purchasing relationship with ELC. (ECF No. 143, Ex. 20 at 1.) Although conceding that the undisclosed bidder did not yet know what information was in DFA's bid, Dingle urged the City to check whether DFA represented that it would carry ELC products and then speak to ELC to confirm that that representation is true.

On December 22, 2011, Smith, the City's Chief Procurement Officer, notified DFA that he had recently received information regarding DFA's participation in the Orlando RFP. He noted that, while DFA's proposal had identified 19 SKUs (stock keeping units) of ELC's products, he had been advised that DFA could not carry ELC's products. Smith requested that DFA confirm that it could carry these products. DFA confirmed that it could carry the products listed because DFA still had these 19 SKUs in its outstanding inventory. Shortly thereafter in early January 2012, the Atlanta City Council passed a resolution awarding the duty-free concessions to DFA and the Mayor approved it.

On January 13, 2012, Carl Gebo, an attorney for WDF, wrote to Bottrie asking him to confirm whether DFA is authorized to sell ELC products. (ECF No. 143, Ex. 21.) Gebo had obtained a copy of DFA's proposal and noted that several brands of fragrances owned by ELC were listed as being sold in DFA's proposal. Gebo was aware of DFA's conduct during the Orlando RFP process (WDF bid on that process). Based on the public information that ELC had decided not to supply DFA with ELC products in support of DFA's Orlando proposal, Gebo noted that it appeared that DFA was similarly misrepresenting its ability to carry ELC products to the Atlanta Airport.

Bottrie wrote back to Gebo on January 19, 2012. Bottrie confirmed that ELC did not have a commercial relationship with DFA and had no plans to enter into such a relationship. Thus, "DFA does not have authority to offer our product lines in their operations." (ECF No. 143, Ex. 22.) DFA alleges that this last statement is untrue as applied to Atlanta because DFA had the ELC products it was offering in its outstanding inventory. But DFA does not allege that ELC knew or had any way of knowing precisely what products DFA had in its outstanding inventory.

On January 17, 2012, Nuance sent a letter to Atlanta's Chief Procurement Officer formally protesting the award to DFA and accusing DFA of misrepresentations. (ECF No. 143, Ex. 23.) The letter recounted DFA's recent experience in bidding on the Orlando Airport RFP and how Brown, the Orlando Airport Executive Director, found that DFA had made misrepresentations in its bid about its ability to carry ELC products. Because DFA had listed ELC

fragrances in its Atlanta bid, and because Nuance's "information suggests DFA does not have access to the Estée Lauder family of brands," the letter argued that DFA appeared to have made material misrepresentations in its bid, and the letter exhorted the City of Atlanta to contact ELC and confirm for itself whether DFA has a business relationship with ELC.  (*Id.* at 4-6.)  According to the letter, whether a duty-free operator could carry ELC products mattered because, for example, ELC products have represented about 20% of all cosmetic and fragrance sales and 9% of gross sales at the Orlando Airport's duty-free stores.  A lack of access to ELC products would therefore "cast doubt on the validity of DFA's projected revenue streams."  (*Id.* at 3.)

On January 24, 2012, an attorney from Nuance contacted Bottrie, asking him to confirm whether DFA had a direct commercial relationship with ELC. (ECF No. 143, Ex. 24.)  Bottrie wrote back that same day and confirmed that ELC did not have a commercial relationship with DFA and had no plans to enter into such a relationship.  "Therefore DFA is not authorized to represent that it has ability to sell Estée Lauder Companies/ brands in its stores."  DFA alleges that this last statement is untrue as applied to Atlanta because DFA had the ELC products it was offering in its outstanding inventory.  But DFA does not allege that ELC knew or had any way of knowing precisely what products DFA had in its outstanding inventory.

# Analysis

## A.    Motion-to-dismiss standard

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept all of the Complaint's well-pled factual allegations as true and construe them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Though the Rule does not require detailed factual allegations, it does require "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets, internal citation, and internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  So a pleading that offers mere "labels and conclusions" or

"a formulaic recitation of the elements of a cause of action" will be dismissed. *Id.*

In applying the Supreme Court's directives in *Twombly* and *Iqbal* to a motion to dismiss, the Eleventh Circuit has instructed that

> a court should 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Further, courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (brackets, internal citations, and quotation marks omitted). The plausibility standard of *Twombly* and *Iqbal* "applies to all civil actions." *Id.*

## B.    DFA's attempted-monopolization claim under § 2

The first issue is whether DFA has stated a valid claim that ELC violated § 2 of the Sherman Act by attempting to monopolize the relevant markets, which DFA defines as beauty products sold in duty-free stores in U.S. airports and the submarkets of cosmetics products (makeup and skin care) sold in duty-free stores in U.S. airports. An attempted-monopolization claim under § 2 requires that a plaintiff prove (1) that the defendant specifically intended to monopolize, (2) that the defendant engaged in predatory or anticompetitive conduct to achieve that intent, and (3) that there was a dangerous probability the defendant would succeed in achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S 447, 456 (1993). *Monopoly power* is "the power to raise prices to supra-competitive levels or the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) (ellipses and internal quotation marks omitted). ELC argues that DFA does not plausibly allege the second or third element, and that DFA fails to define a proper relevant market, as it must. Because the Court finds DFA's allegations regarding the second element wanting, the analysis ends there.

The first anticompetitive conduct DFA alleges is ELC's refusing to deal with DFA and its business partner Stellar during the Orlando RFP. But the fundamental flaw with this argument is that ELC has the right to choose with whom it deals: "as a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private

business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Communications Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("*Trinko*") (brackets and internal quotation marks omitted).   Though an exception to this rule exists, the exception "is at or near the outer boundary of § 2 liability" and thus is narrow: at a minimum, it applies only when a defendant with monopoly power unilaterally terminates voluntary business dealings with a competitor in circumstances strongly suggesting that the termination was designed to achieve an anticompetitive end. *Id.* at 408-410.   This Court is especially reluctant to find that ELC's refusal to deal constitutes anticompetitive conduct under § 2 because DFA not only can—but has been able to—purchase, sell, and develop demand for beauty products from other suppliers.[7]   In other words, the resource that it seeks from ELC is something that DFA can acquire on its own: "[g]enerally, a monopolist has no duty to assist its (potential) rival by dealing with it or providing it access to the monopolist's facility, *especially where that rival can reasonably develop, on its own, the resource it seeks from the monopolist.*" *See Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 763 F. Supp. 2d 1341, 1350 (S.D. Fla. 2011) (emphasis added) (Huck, J.). Moreover, DFA does not allege that ELC terminated their business relationship. And at the hearing on ELC's current motion to dismiss (ECF No. 160), DFA admitted that it—not ELC—terminated the business relationship.   On the facts alleged in DFA's Amended Complaint, the Court is not willing to hold that ELC engaged in anticompetitive conduct for purposes of § 2 when it refused to resume a business relationship that DFA had unilaterally terminated.   With respect to Stellar, the exhibits attached to the Amended Complaint make it clear that ELC had already stopped dealing with Stellar, both directly and indirectly, years before DFA and Stellar partnered together during the Orlando Airport RFP process.   So ELC's pronouncement during that process that it would refuse to deal with Stellar did not constitute a change in its current relationship with Stellar.   So DFA's allegations do not plausibly establish that ELC engaged in anticompetitive conduct when it refused to deal with DFA or Stellar.

DFA next alleges that ELC engaged in anticompetitive conduct by submitting false or misleading information about DFA and ELC products to airport authorities. But false statements constitute anticompetitive conduct

---

[7] DFA alleges that it is an innovator in the duty-free industry that "is able to increase gross sales at airports above what other duty free operators are capable of achieving through its innovative displays, product offerings, marketing techniques, and business model." (ECF No. 143 at 14.)

only if those statements "overcome a presumption that [their] effect on competition . . . was de minimis." *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). To do so requires showing that the statements were "[1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals. *Id.* (brackets in original) (internal quotation marks omitted). DFA has not alleged facts satisfying this test.

The representations DFA complains about fall into two groups: representations by ELC and representations by other duty-free stores that have a business relationship with ELC. Neither group of representations plausibly constitutes anticompetitive conduct by ELC. The Court analyzes each in turn to show why.

ELC's challenged representations are truthful. With respect to the letter ELC sent to Tuttle about the Newark RFP, the letter contains only truthful statements conveying which duty-free operators are authorized to sell ELC products and then promoting these operators by conveying ELC's unsurprising opinion that the operators it has chosen to associate itself with are quality operators. The letter does not even mention DFA. Nor does it otherwise imply "by negative inference," as DFA contends, that it is "not a 'quality' duty free operator." (ECF No. 143 at 21.) At most, the letter merely suggests that ELC had an interest in seeing that one of its authorized duty-free retailers (as opposed to a retailer with whom it does not deal, like DFA) was awarded Newark's duty-free concessions. And since ELC submitted the letter before finals bids were submitted, ELC did not know for sure which duty-free operators would submit bids. But it was reasonable for ELC to assume that at least one duty-free operator that it had a relationship with would submit a bid—indeed, DFA alleges that Dufry had informed ELC that it would likely bid on the Newark RFP. Since the cost to ELC of writing a short, factual letter is small, but the benefit from having the winning bidder being able to sell its products is very large in comparison, one could reasonably assume that deciding to write the letter would be an easy business decision for ELC.

ELC's other representations are truthful as well. ELC truthfully informed the contractor running the Boston RFP that ELC did not deal with DFA. And Bottrie telling Brown which of the bidders it had a direct purchasing relationship with is truthful information as well. With respect to the Atlanta Airport RFP process, DFA does not allege that ELC told the Atlanta decision makers anything directly. ELC did tell representatives from Nuance and WDF

that it did not have a relationship with DFA and had no plans to enter into such a relationship. But again, this is truthful information.

ELC also told Nuance and WDF in connection with the Atlanta Airport RFP process that DFA is not authorized to sell ELC products and that DFA is not authorized to represent that it has the ability to sell ELC products. DFA argues that this is untruthful with respect to Atlanta because DFA had some existing ELC products in its inventory that it could sell. But DFA does not allege that ELC knew or should have known precisely what products DFA had in its outstanding inventory. (This of course makes sense because it seems far fetched to presume that ELC would know or should know what products a duty-free operator has in inventory when ELC has not had a relationship with that operator for several years.) And ELC never stated that DFA could not sell products that DFA actually owned. So the more plausible interpretation of ELC's statements is that it was conveying that DFA cannot purchase ELC products to sell. *See Kivisto*, 413 F. App'x at 138 ("Further, courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer."). And that's true. So for even stronger reasons, DFA's allegations have failed to plausibly establish that these statements were "*clearly false.*" *See American Professional Testing*, 108 F.3d at 1152 (emphasis added).

Besides, even if DFA had plausibly established that these statements were clearly false (it hasn't), DFA has failed to plausibly allege that the statements were "not readily susceptible of neutralization or other offset." *Id.* DFA alleges that it was able to confirm to Atlanta's Chief Procurement Officer that it had in inventory the ELC products listed in its bid, and that after confirming this, DFA was able to win the Atlanta Airport duty-free concession. So DFA's allegations establish that these statements were readily susceptible of neutralization. For all these reasons, ELC's statements do not constitute anticompetitive conduct.

The representations by other duty-free operators during the four airport RFP processes do not constitute anticompetitive conduct by ELC. The fundamental problem with this theory of anticompetitive conduct is that DFA offers no authority or basis that would allow the Court to impute allegedly false statements made by these operators to ELC. DFA does not allege that these other duty-free operators were agents of ELC. In fact, these duty-free operators are entirely separate companies from ELC whose relationship to ELC is based on the fact that they buy ELC products. Nor does DFA allege that ELC conspired with these other duty-free operators to prevent DFA from winning

duty-free concessions at airports.[8]  Absent agency principles or a conspiracy, the Court does not understand how ELC can be deemed to have committed anticompetitive conduct through a false-statement theory when the false statements are made by third parties.

The two cases DFA cites under its false-representations theory of anticompetitive conduct are unhelpful.  In *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1988), the plaintiff, CBS, sued the defendants, CCC and C&W, for conspiring to maintain CCC's monopoly, among other things.  148 F.3d at 1082.  The Court found that the allegations that both defendants had made fraudulent misrepresentations were sufficient to bring the defendants conduct within the ambit of anticompetitive conduct.  *Id.* at 1087.  So not only was this an antitrust conspiracy case, but CBS had alleged that both defendants had made misrepresentations.  Nothing in the case comes even close to suggesting that a defendant has engaged in anticompetitive conduct based on false statements made by third parties when there is no allegation of conspiracy.  DFA's second case, *in re Gobapentin Patent Litigation*, 649 F. Supp. 2d 340 (D.N.J. 2009), is also of no help to DFA.  The allegations of anticompetitive conduct in the counterclaims that the court found sufficient to withstand a Rule 12(b)(6) challenge all related to the plaintiffs' own conduct.  649 F. Supp. 2d at 343-44 n.4, 352-53.

The Court concludes that under these circumstances, alleged false statements by third parties cannot be imputed to ELC for purposes of establishing anticompetitive conduct by ELC.  Further supporting the soundness of this conclusion is the fact that the information ELC gave to the third parties was true and certainly not clearly false.  ELC supplied the operators with truthful information concerning who ELC would deal with and with market-share information.  Finding that DFA has plausibly alleged anticompetitive conduct by ELC in these circumstances would be unjust and expand antitrust liability beyond its current scope in a way that strikes the Court as difficult to limit and therefore dangerous.

Even if the Court were to conclude that the operators' statements can somehow be imputed to ELC for purposes of antitrust liability, DFA would still fail to plausibly establish anticompetitive conduct under *American Professional Testing*.  The third element requires DFA to plausibly show that the statements

---

[8] DFA's original complaint did allege an antitrust conspiracy between ELC and other duty-free operators that violated § 2, but the Court found that claim invalid and dismissed it.  DFA has not repled it.  DFA's only antitrust count is that ELC itself attempted to form a monopoly.  There are no conspiracy allegations.

were "made to buyers without knowledge of the subject matter." *American Professional Testing*, 108 F.3d at 1152. The statements in question were made by operators to airport authorities. But the exhibits DFA attached to its complaint about the Orlando RFP process show that the Orlando Airport was anything but a buyer without knowledge of the subject matter. The Orlando Airport hired a consultant to evaluate the bid proposals of the duty-free operators, interviewed the operators about their bids, held a lengthy appeal hearing where it heard arguments from DFA and other duty-free operators, and Brown, the executive director, wrote a lengthy appeal decision relying on a host of authority. This authority included information provided by the duty-free operators, the consultant, sales data from other airports, and so on. All of this information was obtained and used so that the Orlando Airport could make a reasoned decision about which operator would be best to run the duty-free stores at that airport. Though DFA does not provide similarly detailed information about the other three airports' RFP processes, it is reasonable to infer that those airports also obtained a wide variety of information in order to be able to intelligently evaluate the bids they received. So DFA has plausibly alleged that the airports have knowledge of the subject matter. Statements to them about the necessity of having ELC products to succeed do not overcome the presumption that the statements' effect on competition was de minimis. *Id.* The airports are quite capable of deciding on their own what is and isn't important for a duty-free operator to run a successful duty-free store.

DFA's final allegations of anticompetitive conduct relate to ELC's display-space requirements, excess-inventory requirements, full-line forcing, and tying. (For ease of reference, the Court will refer to all of this conduct collectively as full-line-and-tying conduct.) But DFA's allegations that ELC engaged in full-line-and-tying conduct directed at DFA are barred by the four-year statute of limitations under 15 U.S.C. § 15b. DFA alleges that this conduct occurred with respect to DFA no later than March 2008. (ECF No. 143 at 33-34 (display space and inventory demands), 37 (full-line forcing), 38 (tying).) Because DFA brought this suit more than four years later on April 26, 2012, these claims are barred by 15 U.S.C. § 15b.

ELC pointed this out in its motion to dismiss. DFA does not contest the fact that these claims relate to conduct that is more than four-years old. Instead, DFA asserts that because it has sought injunctive relief and not just treble damages that its allegations are not barred by the four-year limitations

period in §15b.[9]   (ECF No. 168 at 11.)   This argument is unpersuasive. Because ELC does not sell to DFA, DFA does not and cannot allege a "cognizable danger" that ELC's alleged display-space requirements, excess-inventory requirements, full-line forcing, and tying will recur with respect to DFA.  And showing cognizable danger is necessary "[t]o establish a claim for injunctive relief under [15 U.S.C. § 26]."  *See Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 870 (9th Cir. 1991).  Even if DFA had met the threshold showing for injunctive relief, the claim would still be barred by the doctrine of laches.  Although there is no statute of limitations contained in 15 U.S.C. § 26 for injunctive relief, some courts have suggested that the four-year limitations period in § 15b for damage actions is "determinative of the equity result as well."  Phillip E. Areeda, Herbert Hovenkamp, *Antitrust Law* vol. II, § 320g, 326 (3d ed., Aspen 2007).  Under the facts of this case, the Court would apply the doctrine of laches and adopt the four-year period of § 15b.  DFA knew about the conduct it complains about, and there is no reason why it could not have brought suit sooner.

DFA next argues that the full-line-and-tying conduct of ELC has continued through the filing of its Complaint, thereby rendering its claims timely.  But all of the full-line-and-tying conduct within the limitations period that DFA alleges is ELC conduct directed at other duty-free operators.  (*See* ECF No. 168 at 12; ECF No. 143 at 36-37, 39.)  So while it is true that each new antitrust violation starts a new four-year limitations period with respect to suing over that particular violation and any damages accruing from it, *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 338-39 (1971), that does not help DFA because DFA does not have standing to sue based on full-line-and-tying conduct directed against other duty-free operators.

To establish antitrust standing, a plaintiff must show that he or she "has suffered an antitrust injury" and that he or she is "an efficient enforcer of the antitrust laws."  *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013) (internal quotation marks omitted).  *Antitrust injury* is "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."  *Id.* at 1271 n.16 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  To determine if a plaintiff is an efficient enforcer, courts consider the following factors:

---

[9] Although there is a four-year statute of limitations on damage actions under 15 U.S.C. 15b, there is no limitations period specified in 15 U.S.C. § 26, the antitrust law that authorizes suits for injunctive relief by private parties.

(1) the directness or indirectness of the asserted injury; (2) the remoteness of the injury; (3) whether other potential plaintiffs were better suited to vindicate the harm; (4) whether the damages were highly speculative; (5) the extent which the apportionment of damages was highly complex and would risk duplicative recoveries; and (6) whether the plaintiff would be able to efficiently and effectively enforce the judgment.

*Id.*

DFA cannot establish antitrust injury from the full-line-and-tying conduct or that it is an efficient enforcer. The injury DFA identifies as giving it standing is "the loss of specific airport duty free contracts" due to ELC's conduct.[10] (ECF No. 168 at 12.) But DFA fails to explain how that injury is connected to ELC's full-line-and-tying conduct directed at other duty-free operators. And the Court fails to see how such conduct directed at other duty-free operators has in any way contributed to DFA losing airport contracts. This is necessary because antitrust injury is an injury "that flows from that which makes the defendants' acts unlawful." *Sunbeam*, 711 F.3d at 1271 n.16 (internal quotation marks omitted). Moreover, DFA's Amended Complaint undermines the contention that ELC's full-line-and-tying conduct directed at other operators has contributed to DFA losing airport contracts. DFA alleges that "DFA has lost U.S. airport duty free bids *because of* ELC's refusal to deal with DFA" and disparagement stemming from that refusal. ECF No. 143 at 19-20 (emphasis added). So DFA cannot establish an antitrust injury resulting from ELC's full-line-and-tying conduct directed at other duty-free operators.

Nor has DFA established that it is an efficient antitrust enforcer with respect to ELC's full-line-and-tying conduct directed at other duty-free operators. The above discussion makes plain that any injury DFA suffers as a result of this conduct by ELC is indirect and remote, and that the damages stemming from it would be highly speculative. Moreover, the other duty-free operators that ELC is actually directing the full-line-and-tying conduct at are "better suited to vindicate the harm." *Sunbeam*, 711 F.3d at 1271. So the first four factors outlined in *Sunbeam* weigh against concluding that DFA is an efficient enforcer with respect to this conduct by ELC. DFA therefore lacks standing to bring antitrust claims resulting from ELC's full-line-and-tying conduct directed at other duty-free operators.

---

[10] DFA asserts that customers who benefit from DFA's competitive conduct and the airport authorities who forgo the additional revenue from DFA's bid are also injured, but their injury is derivative and premised on DFA losing duty-free airport contracts. (ECF No. 168 at 12.)

Because all of ELC's full-line-and-tying conduct directed at DFA is outside the limitations period, and because DFA does not have standing to bring claims resulting from this same conduct directed at other duty-free operators, DFA has failed to allege facts that make it plausible that ELC's full-line-and-tying conduct is actually anticompetitive conduct. Because DFA has failed to sufficiently allege any anticompetitive conduct by ELC, its § 2 claim fails.

## C. DFA's tortious-interference claim

The Court now analyzes whether DFA has stated a valid claim for tortious interference with a business relationship under Florida law. DFA alleges that ELC tortiously interfered with DFA's prospective business relationships with the Newark, Boston, and Orlando Airport Authorities by taking actions that prevented DFA from securing duty-free concessions from these airports. (ECF No. 143 at 48-51.) To prevail on a tortious-interference claim, the plaintiff must prove "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (ellipses omitted). DFA fails to allege a plausible tortious-interference claim.

The first problem with DFA's tortious-interference claim centers on the third element: whether ELC has "intentional[ly] and unjustified[ly] interfere[d] with the relationship." *International Sales & Service, Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen*, 647 So.2d at 814. Determining whether a defendant "acted without justification" under the third element "requires an examination of the defendant's conduct, its motive, and the interests it sought to advance." *Security Title Guarantee Corp. of Baltimore v. McDill Columbus Corp.*, 543 So.2d 852, 855 (Fla. 2d DCA 1989) (internal quotation marks omitted). If defendants act to safeguard or promote their own financial interests and do not employ improper means in doing so, then they have not tortiously interfered with the plaintiff's business relationship. *Id.*

With respect to this element, DFA alleges that ELC directly, or indirectly through other duty-free operators, *falsely* represented to the decision makers at Newark, Boston, and Orlando (1) that because DFA did not carry ELC products, DFA's financial terms were unrealistic, unachievable, and DFA would be unable to satisfy them; (2) that DFA could not sell ELC products that it had in inventory; and (3) that DFA is not a quality duty-free operator. (ECF No. 143 at 48-50.) The allegedly false representations that constitute ELC's tortious

conduct are the same allegedly false representations that constitute anticompetitive conduct by ELC.

The representations that ELC actually made itself (as distinguished from the representations made by other duty-free operators) were truthful, not false, as the Court has already discussed above in the § 2 antitrust claim. Moreover, ELC's letter to Newark contained only truthful statements and did not even mention DFA. That letter therefore did not disparage DFA. And ELC obviously promotes its own financial interest by communicating to airport authorities about either (a) the duty-free operators that it deals with or (b) the fact that it does not deal with DFA. Communicating this information increases the likelihood that the selected operator will sell ELC products. DFA does not allege that there are rules prohibiting ELC from contacting decision makers during the RFP process.[11] So the most plausible conclusion is that ELC's own representations did not constitute improper means[12] and that they were done to advance ELC's own financial interest. *See Kivisto*, 413 F. App'x at 138 ("Further, courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.").

The same analysis applies to ELC's communications to other duty-free operators confirming that ELC did not deal with DFA. Those communications were truthful, certainly not improper—in fact, most of these communications were in response to the duty-free operator asking ELC to confirm whether it dealt with DFA or to confirm which the bidders it dealt with. And the most plausible interpretation of these communications is that they were also made to safeguard or promote ELC's financial interest because ELC could reasonably assume that the operators would pass this information along to the airport authorities, thereby increasing the likelihood that the selected operator will sell ELC products.

---

[11] Indeed, Brown, the executive director of the Orlando Airport Authority called Bottrie as part of that RFP process. (ECF No. 143, Ex. 17.)

[12] Although DFA does allege that ELC's letter to Newark was unsolicited, unprovoked, and "was and is unprecedented in the duty free airport concession industry," DFA does not allege that the letter violated a rule, a failure which is all the more striking since in the Court's Order on ELC's motion to dismiss the original Complaint, the Court specifically rejected DFA's allegation that the letter was improper as a legal conclusion not supported by facts because "DFA has not alleged that rules prohibited other entities from contacting the decision makers to inform them who they thought would be good duty-free operators." (ECF No. 119 at 9 n.7.)

So DFA has failed to plausibly allege that any of ELC's direct representations were unjustified.   That leaves DFA with the allegedly false representations made by duty-free operators.  As with its antitrust claim, DFA offers no basis to impute allegedly false representations by duty-free operators to ELC.  DFA does not allege that these other duty-free operators were agents of ELC.  In fact, these duty-free operators are entirely separate companies from ELC whose relationship to ELC is based on the fact that they buy ELC products.  Nor does DFA allege that ELC conspired with these other duty-free operators to tortiously interfere with DFA's prospective business relationships with the Newark, Boston, and Orlando airports.  And the governing test for the third element focuses the attention on the defendant's conduct, not someone else's: "an intentional and unjustified interference with the relationship *by the defendant*."   *Ethan Allen*, 647 So. 2d at 814 (emphasis added) (internal quotation marks omitted).   Note also that DFA never alleges that ELC represented to the airports or the other duty-free operators that because DFA did not carry ELC products, DFA's financial terms were unrealistic or unachievable.  This representation came solely from the operators.  Since ELC made only truthful representations to the operators, it is not plausible that ELC is somehow liable for an entirely different (and allegedly false) representation made by the operators.

DFA therefore fails to allege a plausible tortious interference claim.

## D.    DFA's Lanham Act claim

DFA alleges that certain statements made by Nuance and Travel Retail in connection with the Orlando RFP process were false and misleading; that these statements therefore violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and that ELC in turn is liable for contributory false advertising under the contributory-liability doctrine announced by the Supreme Court in *Inwood Laboratories, Inc. v. Ivese Laboratories, Inc.*, 456 U.S. 844 (1982).  For the reason set forth below, DFA's contributory-false-advertising claim fails.

DFA's claim is invalid because it fails to allege a plausible claim for the underlying *direct* liability for false advertising.  To state a valid contributory-false-advertising claim, a plaintiff must also allege a valid claim for the underlying *direct* liability for false advertising.  *See Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 599 (E.D. Va. 2013) (holding that a "contributory infringement [claim under the Lanham Act] cannot exist without the underlying direct infringement claim[]").  One essential element of a false-advertising claim under § 43(a) requires the plaintiff to "demonstrate that the commercial advertisement or promotion is either literally false, or that if the advertisement is not literally false, it is likely to mislead or confuse consumers." *Pizza Hut,*

*Inc. v. Papa John's International, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (brackets and internal quotation marks omitted).   And the challenged statement must be "one of fact" rather than "one of general opinion" because only facts are actionable under § 43(a).   *Id.* at 495-96.   "A statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification."   *Id.* at 496 (brackets and internal quotation marks omitted).

The statements that DFA alleges constitute false advertising are merely predictions about sales prospects and thus are opinions.   The four statements alleged by DFA are as follows:

1. *Nuance to Atlanta*: "Given that Estée Lauder brands account for 20% of cosmetic and fragrance sales, at least in Orlando, and cosmetic and fragrance sales constitute one of the largest sources of revenue for duty free stores, a lack of access to Estée Lauder brands would cast doubt on the validity of DFA's projected revenue streams." (ECF No. 143, Ex. 23 at 3-4.)

2. *Travel Retail to Orlando*: "[W]e strongly believe that Estée Lauder is a product which you have to sell, also, to domestic passengers." (*Id.*, Ex. 4 at 58-59.)

3. *Nuance to Orlando*: "With respect to DFA, I'd like to echo Travel Retail's concerns on DFA's rents. . . .   DFA sales projects are deemed to be unreasonable and not sustainable in light of the history." (*Id.* at 69.)

4. *Travel Retail to Orlando*: "[F]ailure to offer the Estée Lauder product line will negatively impact duty free and duty paid sales revenue for both international and domestic travelers." (*Id.*, Ex. 16 at 3.)

All of these statements are predictions that do not lend themselves to empirical verification and are thus opinions.   The first through third statements use language that signals an opinion: "cast doubt," "strongly believe," and "deemed to be unreasonable."   Moreover, all of them are predictions about future commercial events and are thus opinions.   *See PhotoMedex Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010).   In March 2003, the defendants in *Photomedex* had informed PhotoMedex, the plaintiff, that their laser device would be available for purchase that summer.   But the defendants did not in fact ship their laser device until over a year after summer 2003.   *Id.*   The prediction about the laser's release date was a mere opinion about a future event, which is generally not actionable.   *Id.*   The exception to this rule is if the "speaker has knowledge of facts not warranting the opinion.   An honest or sincere statement of belief about a future event is not actionable, but a statement known at the time by the speaker to be false, or a statement by a speaker who lacks a good faith belief in the truth of the statement, may constitute an actionable

misrepresentation." *Id.* (internal citations and quotation marks omitted).  DFA does not allege that Nuance and Travel Retail knew their statements to be false when they made them or that they lacked a good-faith basis for believing in the statements when they made them.  Moreover, it's plausible that Nuance and Travel Retail genuinely believed in these statements. DFA alleges throughout its Amended Complaint that ELC demanded that the operators whom it sold to acceded to various demands that DFA alleges were onerous.  It is unreasonable to assume that an operator would put up with these demands as Nuance and Travel Retail have if they did not believe that being able to sell ELC products was an advantage in the duty-free business.

Because the statements that DFA complains about are opinions that cannot support a § 43(a) claim, DFA has failed to state a valid Lanham Act claim.

## Conclusion

For the above reasons, the Court **grants** ELC's Motion (ECF No. 160) and **dismisses** DFA's claims.  Because the Court previously granted ELC's motion to dismiss DFA's original Complaint, and because the original Complaint contained antitrust claims and a tortious-interference claim, DFA has already had an opportunity to amend these claims.  Moreover, DFA's Amended Complaint came after it obtained tens of thousands of documents from ELC. Because DFA has already had an opportunity to amend its antitrust and tortious-interference claims but has failed to state valid claims even after obtaining extensive discovery, the Court concludes that any further amendment of these claims would be futile.  The Court therefore **dismisses** these claims **with prejudice**.  *See Rogers v. Nacchio*, 241 F. App'x 602, 610 (11th Cir. 2007) ("Generally, a party should be given at least one opportunity to amend before the district court dismisses a complaint with prejudice.").

The Lanham Act claim in DFA's Amended Complaint is a new claim.  So the dismissal of DFA's current claims is **without prejudice**.  But given DFA's failure to state a valid claim after obtaining extensive discovery and having two chances to state a valid claim, the Court cautions DFA to be mindful of its Rule 11 obligations in repleading this claim or bringing a new claim.  If DFA decides to amend its Amended Complaint, it must do so by April 11, 2014.

**Done and ordered** in chambers, at Miami, Florida, on March 31, 2014.

**Robert N. Scola, Jr.**
**United States District Judge**